IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DISTRICT

KENNETH M. JONES                                                                    PLAINTIFF

VS.                                                      CIVIL ACTION NO. 3:18-CV-281 CWR-FKB

THE MISSISSIPPI SECRETARY OF
STATE'S OFFICE, CARLA THORNHILL,                                          DEFENDANTS
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY, DOUG DAVIS,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY, KIM TURNER,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY, AND JOHN DOES 1-10

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Kenneth M. Jones lost out on a promotion to a colleague his employer—the Mississippi Secretary of State's Office—deemed more qualified; broke numerous office rules; commandeered office resources for personal work; submitted falsified time records to his employer; and lost his job after he was caught.  Mr. Jones, invoking Title VII of the Civil Rights Act and 42 U.S.C. §§ 1981 and 1983, contends that these adverse actions resulted from his employer's alleged racial and retaliatory animus, and not from his own performance, deficiencies and admitted violations of policies which state personnel regulations provide are terminable offenses.  But he has presented no competent summary judgment evidence upon which a reasonable juror could credit this theory, and his claims against the individual defendants—Doug Davis, Carla Thornhill, and Kim Turner— fail in any event given those individuals' qualified immunity.  There is no justification for a trial on Mr. Jones' claims.  And, even if there were, two categories of damages claimed by Mr. Jones are off-limits to him.  Defendants seek summary judgment.

## UNDISPUTED MATERIAL FACTS

Kenneth M. Jones is an African-American male who began working as a full-time employee for the Mississippi Secretary of State's Office on June 1, 2006. *See* **Pl's. Compl., Doc. No. 88, at ¶ 10.** Mr. Jones was hired as a Lobbying Compliance Officer. *Id.* In that role, Mr. Jones was responsible for providing necessary forms and issuing certificates of registration to lobbyists conducting business in Mississippi; analyzing and organizing documents submitted by lobbyists; and preparing and publishing reports available for inspection by the public. *See* **Affidavit of Carla Thornhill, Mot. Exh. 1, at ¶4.**

But, less than a year after beginning work for the Secretary of State's Office, Mr. Jones indicated interest in a career change. On May 15, 2007, he submitted an Application for Admission to Hinds Community College ("HCC"). *See* **Hinds Community College Records, Mot. Exh.2, at MSOS-HCC 000024; Excerpts from Deposition of Kenneth Jones, Mot. Exh. 3, at 40:15-41:22.** On the application, Mr. Jones specified that his intention was to enter a "Pre-Med" program of study for "Career" purposes. *See* **Hinds Community College Records, Mot. Exh.2, at MSOS-HCC 000024.** This application began an academic career that saw Mr. Jones register for at least 50 hours of classes at HCC through the fall semester of 2017. *See id.* **at MSOS-HCC 0000006; Jones Deposition Excerpts, Mot. Exh. 3, at 42:11-45:14.** During the same period, Mr. Jones also took classes at Mississippi College. *See* **Mississippi College Records, Mot. Exh. 4, at MSOS-MC 000002-000003; Jones Deposition Excerpts, Mot. Exh. 3, at 45:15-46:25** He did not inform his supervisors at the Secretary of State's Office about his academic pursuits or career plans. *See* **Jones Deposition Excerpts, Mot. Exh. 3, at 41:23-42:1.** However, he recognized at least once that his coursework could compromise his ability to perform his full-time job duties: Before the conclusion of the Fall 2009 semester, when he was taking six credit hours at HCC, Mr. Jones filed a formal request for withdrawal from all classes. It stated, "I have a job conflict." *See*

**Hinds Community College Records, Mot. Exh.2, at MSOS-HCC 0000033; Jones Deposition Excerpts, Mot. Exh. 3, at 47:24-49:9.**   His six hours of HCC coursework, Jones admitted, conflicted with his job at the Secretary of State's Office.   *See* **Jones Deposition Excerpts, Mot. Exh. 3, at 49:2-9.**

Meanwhile, the quality of his work became the subject of complaints at the Secretary of State's Office.   *See* **Thornhill Affidavit, Mot. Exh. 1, at ¶13, & Exh. C.**   Mr. Jones' writing required regular correction.   *See id.* **at Exh. C.**   On one occasion, his supervisor had to correct some 44 letters prepared by Mr. Jones to be sent to lobbyists for not adhering to agency style guidelines.   *See id.* **at Exh. C, at MSOS 000245-000292.**   On another, Mr. Jones responded as follows regarding an email inquiry from a member of the public concerning contribution limits applicable to initiative campaigns:   "Kim and Hawley are both copied on this email and confirmed that regarding donations; [*sic*] similar to other non-judicial reports. The limitations on corporations are $1000.00 rather [*sic*] in state or out of state. In addition, no [*sic*] limitations on individuals."   *Id.* **at Exh. C, at MSOS 000664-000665.** Carla Thornhill, then the Director of Human Resources, noted, "His supervisors found Mr. Jones' writing to be especially poor relative to his academic record."   *See id.***, at ¶13.**   "I am sorry he feels like I am micromanaging him," a supervisor wrote in a March 2013 e-mail that detailed Mr. Jones' deficient and behind-schedule work product, "but it is obviously necessary."   *Id.***, at Exh. C, at MSOS 000319**.

The agency considered this record in 2016, when Mr. Jones' supervisor resigned[1] and he applied for the job**.   *Id.* at ¶7.** In advertising the position, Director of Elections Compliance, the Secretary of State's Office described its responsibilities:   day-to-day management of Elections

---

[1] The resignation of that supervisor, Miles Forks, a white male, occurred after Defendant Turner recommended his termination for insubordination and poor work product.   *See* **Excerpts of Deposition of Carla Thornhill, Mot. Exh. 6, at 287:8-288:25; Excerpts of Deposition of Kim Turner, Mot. Exh. 5, at 60:18-61:3, 70:20-71:20.**

Compliance personnel; knowledge and tracking of applicable lobbying deadlines; knowledge and tracking of reporting requirements and deadlines for constables; maintenance of municipal, county, and state election returns and certifications; processing qualifying papers for election candidates; generating reports in the Statewide Elections Management System; preparing and publishing sample ballots; organizing and training election-day observers; and responding to inquiries received by the agency through its Elections Hotline as well as Public Records Act requests.  The agency's notice also listed as requirements general knowledge of the Elections Division's functions and related laws; knowledge of state elections laws; strong computer skills, including experience with multiple applications and programs; demonstrated written and oral communication skills; strong organizational skills; an orientation to detail; experience in editing and/or proofreading; and the ability to adapt to changing situations, tasks, time pressure and deadlines.  ***Id.* at ¶6 & Exh. A.**  As described by Defendant Kim Turner, then Assistant Secretary of State for Elections, the Director of Elections Compliance job "was not a glamorous position. … It … required a lot of organizational skill, a lot of work, and [was] administrative in general." ***See* Excerpts of Deposition of Kim Turner, Mot. Exh. 5, at 101:17-21.**

Three applicants sought the job, and the Secretary of State's Office selected Andrew Dailey.  ***See* Thornhill Affidavit, at ¶¶ 7, 14.**  Kim Turner, then Assistant Secretary of State for Elections, interviewed all three candidates along with the then-Director of Human Resources, Carla Thornhill.  ***Id.* at ¶ 8.**  They reviewed each candidate's employment records and performance, and Ms. Turner also solicited input from Hawley Robertson, senior attorney in the Elections Division.  ***Id.***  Ms. Thornhill, Ms. Turner, and Ms. Robertson agreed that Mr. Dailey was the best choice for the open position.  ***Id.* at ¶ 9.**  This unanimous consensus resulted in a recommendation to Doug Davis, then the Chief of Staff, that Mr. Dailey receive the promotion;

Mr. Davis approved. *Id.* **at ¶ 14.** Mr. Dailey is a white male. *See* **Pl's. Compl., Doc. No. 88, at**

**¶ 10.** No mention of race is included in an April 15, 2016 email from Ms. Turner to Ms. Thornhill

summarizing the reasons for the promotion. **Thornhill Affidavit, at Exh. B.** Ms. Turner's e-mail

noted that Mr. Dailey had volunteered for and "successfully performed many duties of" the

Director of Elections Compliance position following the departure of the former incumbent. *Id.*

Mr. Dailey's other qualifications are spelled out in detail. *Id.*

The interview of Mr. Jones influenced the decision not to select him for the position,

Defendants Thornhill and Turner testified. Mr. Jones' interview, recalled Defendant Turner, "was

terrible. Kenny had no understanding of what the position entailed." *See* **Excerpts of Turner**

**Deposition, Mot. Exh. 5, at 99:6-12**. According to Defendants Thornhill and Turner, Mr. Jones

stated during his interview that he understood the Director of Elections Compliance position would

allow him to lobby the Legislature. *See* **Excerpts of Turner Deposition, Mot. Exh. 5, at 99:13-**

**17; Excerpts of Thornhill Deposition, Mot. Exh. 6, at 110:16-22.** "[W]hen we asked him what

his general knowledge of the position was and what would be required and why he would be

interested in that, he said that he had always wanted to lobby the legislature and this position would

allow him to do that." **Excerpts of Thornhill Deposition, Mot. Exh. 6, at 110:16-22.** Lobbying,

however, "is not part of this position at all." *Id.* **at 110:21-22.** Defendant Turner testified that Mr.

Jones also conveyed a desire in his interview "to start completely anew" on a computerized

lobbyist reporting portal, even though his resume listed its "successful launch" as one of his

achievements as Lobbying Compliance Officer. **Turner Deposition Excerpts, Mot. Exh. 5, at**

**99:18-101:9**. Defendant Turner found Mr. Jones' proposal unwise: "You don't just scrap a

million dollar system and start anew." *Id.* **at 100:12-13.**

Ms. Turner and Ms. Thornhill informed Mr. Jones of the decision on May 18, 2016. **Thornhill Affidavit, Mot. Exh. 1, at ¶ 16.** At the same time, the agency offered Mr. Jones a promotion to the newly created position of Lobbying and Campaign Finance Compliance Officer. ***Id.*, at ¶ 17.** Mr. Jones accepted on May 19. ***Id.*, at ¶ 18.** That job paid $824.00 less annually than the Director of Elections Compliance position. ***Id.*, at ¶ 19.**

Though he accepted the promotion, Mr. Jones filed a Charge of Discrimination against the Secretary of State's Office on June 14, 2016, with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was not selected for the Director of Elections Compliance post because of his race. ***Id.*, at Exh. D.** The Secretary of State's Office filed a Position Statement on July 15, 2016, which contested all assertions in Mr. Jones' Charge. ***Id.*, at Exh. E.** Approximately a year later, on July 20, 2017, the EEOC issued a Letter of Determination adverse to the Secretary of State's Office. ***Id.*, at Exh. F.** On August 23, the Secretary of State's Office filed a Request for Reconsideration with the EEOC. ***Id.*, at Exh. G.** Through a letter dated October 11, the EEOC denied the Request for Reconsideration. ***Id.*, at Exh. H.** The Secretary of State's Office received the EEOC's denial letter on October 13. ***Id.*, at ¶ 25.**

By that time, the agency had uncovered evidence of terminable office policy violations by Mr. Jones. As an employee of the Secretary of State's Office who was not exempt from federal wage and hour laws, Mr. Jones was subject to a Time Reporting Policy that read: "Employees are expected to perform all work duties, in office, between the hours of 8:00 a.m. and 5:00 p.m., Monday through Friday (40 hour work weeks), unless they receive advance written approval from their immediate supervisor to vary their schedules." ***Id.*, at Exh. I.** On September 19, 2017, then-Legislative Director Nathan Upchurch found Mr. Jones in the agency's Heber Ladner Building after 5:00 p.m. ***Id.*, at ¶ 26.** Mr. Jones did not have his supervisor's permission, written or

otherwise, to be in the office past 5.  ***Id.*, at ¶ 28.**  Records reviewed by the agency on September

20 showed that Mr. Jones did not leave the office until 7:58 p.m. on September 19.  ***Id.*, at ¶ 29.**

The Secretary of State's Office began an investigation to ascertain the purpose for which

he was using his office without permission after hours.  ***Id.*, at ¶ 30.**  The agency found that Mr.

Jones did not leave the office until 5:50 p.m. on September 20.  ***Id.*, at ¶ 29.**  On September 22,

the office placed a monitoring application on Mr. Jones' computer to record all activity on his

computer.  ***Id.*, at ¶ 31.**  A review of the records generated by this application showed that Mr.

Jones spent 4 hours and 46 minutes completing non-work activity on September 22; 6 hours and

55 minutes completing non-work activity on September 25, when he left the office at 5:30 p.m.; 5

hours and 46 minutes completing non-work activity on September 26, when he left the building at

6:16 p.m.; 3 hours and 14 minutes completing non-work activity on September 27, when he left

the building at 6:32 p.m.; 2 hours and 33 minutes completing non-work activity on September 28;

and 1 hour and 22 minutes completing non-work activity on September 29.  ***Id.*, at ¶ 32 & Exh.**

**J**; **Affidavit of Russell Walker, Mot. Exh. 7, at ¶¶ 9-10 & Exh. A.**  The records of Mr. Jones'

Internet usage show that he spent much of his work time on sites that corresponded with classes

he was taking at HCC during the Fall 2017 term.  ***See* Thornhill Affidavit, Mot. Exh. 1, at Exh.**

**J; Walker Affidavit, Mot. Exh. 7, at ¶¶ 9-10 & Exh. A; Hinds Community College Records,**

**Mot. Exh. 2, at MSOS-HCC 000006.**

Mr. Jones, however, signed and submitted weekly time cards that did not report the actual

times he left the office on September 19, September 22, September 25, September 26 or September

27.  ***See* Thornhill Affidavit, Mot. Exh. 1, at Exh. K.**  The time cards also did not subtract the

time Mr. Jones spent on non-work activity from the total hours for which Mr. Jones claimed to be

owed wages for work. ***Id.***

Mr. Jones' conduct implicated several office policies in addition to the previously excerpted Time Reporting Policy. The applicable Internet Usage Policy barred "[p]ersonal use" of agency Internet resources that "[i]nterferes with the user's productivity or work performance." *Id.* **at Exh. N.** The agency's Acceptable Computer Use Policy stated, "Employees are responsible for exercising good judgment regarding the reasonableness of personal use," and affirmed that all data created by system users such as Mr. Jones "remains the property of The Mississippi Secretary of State." *Id.* **at Exh. O.** The Mississippi State Employee Handbook mandated that employees "apply themselves to their assigned duties during the full schedule for which compensation is being received." *Id.* **at Exh. L.** The Handbook expressly prescribed discipline for "failure or refusal to…perform assigned work[] or otherwise comply with applicable established written policy," which is labeled a "Group II" offense. *Id.* So, too, was discipline authorized for "Group III" offenses such as "[u]nauthorized use or misuse of State property or records"; acts "occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public"; "[f]alsification of records, such as, but not limited to[] time records…or other official State documents"; and theft. *Id.*

On October 12, the day before the agency received the EEOC letter denying its Request for Reconsideration, the Secretary of State's Office delivered to Mr. Jones a Pre-Disciplinary Action Notice which charged him with all of those Handbook offenses, suspended him with pay, and set a pre-disciplinary conference for October 24. *See* **Thornhill Affidavit, Mot. Exh. 1, at Exh. P.** An initial draft of the Pre-Disciplinary Action Notice was circulated among Ms. Thornhill; Ms. Turner and Mr. Davis on October 2 and finalized on October 10. *Id.*, **at ¶ 34.** The Notice details Mr. Jones' non-work Internet usage from September 22 through September 29, finding that

it "cover[ed] online school coursework (homework, assignments, quizzes, exams) for a significant portion of the workday." *Id.*, at **Exh. P.**   The Notice also specifies multiple work tasks that remained unaccomplished as Mr. Jones completed online class work. *Id.*

The Notice was part of a disciplinary process governed by state personnel regulations that provided Mr. Jones opportunities to review and respond to the notice of his violations of agency policy.  In a written response to the Pre-Disciplinary Action Notice and at the disciplinary hearing held on October 24, Mr. Jones did not deny that he used the Internet for his online classwork; that he recorded time spent on the Internet as work time; or that he was at the agency building without permission after hours.  *Id.*, at **Exh. Q, R.**  To the contrary, at the disciplinary conference, he apologized for the falsification of his timesheets and said he "probably had other timesheets that were incorrect" and for which he nevertheless was compensated.  *Id.*, at **Exh. R.**  Furthermore, Mr. Jones conceded that he "messed up" in using agency Internet resources for personal purposes to the extent that he did.  Finally, he conceded that his work was not being done "at the speed Kim [Turner] desired."[2]  *Id.*

In an October 30 Notice of Termination Letter, the Secretary of State's Office informed Mr. Jones that his employment would be terminated effective November 10 for the violations of policy discussed in the Pre-Disciplinary Action Notice and at the October 24 conference.  ***See* Thornhill Affidavit, Mot. Exh. 1, at ¶ 40.**  There was no further communication between the parties before November 10.  At no point did Mr. Jones resign or inquire about resigning his position.

---

[2] Statements that Mr. Jones made at the disciplinary hearing are quoted in the Notice of Termination he received attached to Carla Thornhill's affidavit as Exhibit S, and the accuracy of those statements has been deemed an admitted fact in this litigation.  ***See* Defendants' First Set of Requests for Admission, Mot. Exh. 8; Order, Doc. No. 51 (deeming Requests for Admission to be admitted).**

Though the Secretary of State's Office was not aware of it, Mr. Jones had already begun another job months before—before disciplinary proceedings had even begun.  Prior to February 1, 2017, Mr. Jones submitted an application to the University of Mississippi Medical Center ("UMMC") for employment as a Nursing Assistant.  *See* **University of Mississippi Medical Center Records, Mot. Exh. 9, at MSOS-UMMC 000028-000034.**  In the application, Mr. Jones stated that he would be available to begin work at UMMC on February 1, 2017.  *Id.* **at MSOS-UMMC 000028.**  As his "reason for leaving" the Secretary of State's Office, Mr. Jones reaffirmed his longstanding intention to change careers: "I am pursuing a career that complements my interests in the health field."  *See id.* **at MSOS-UMMC 000030.**  UMMC hired Mr. Jones, and he had begun work at the medical facility by September 2017.  *See id.* **at MSOS-UMMC 000049 (noting that Mr. Jones began receiving pay from UMMC on September 15, 2017).**  Mr. Jones never received consent from the Secretary of State's Office to accept this outside employment.  He never informed the agency that he was actively seeking outside employment at UMMC prior to September 2017.  This was a direct violation of § 5.14 of the Mississippi State Employee Handbook, which requires "[e]mployees engaging in any outside employment" to "submit a request for approval" to the agency.  *See* **Thornhill Affidavit, Mot. Exh. 1, at Exh. L.**

Unbeknownst to the Secretary of State's Office, Mr. Jones in Fall 2017 was a full-time student at HCC carrying at least 13 credit hours of coursework.  *See* **HCC Records, Mot. Exh. 2, at MSOS-HCC 000006.**  Mr. Jones remained a full-time student from his termination by the Secretary of State's Office in 2017 through May 2019, when he graduated from Mississippi College with a Bachelor's of Science degree in Nursing.  *See* **Jones Deposition Excerpts, Mot. Exh. 3, at 209:7-15.**  He was hired as a registered nurse in September 2019 by Baptist Medical Center but resigned that position in January 2021.  In 2020, his income was at least $75,913.71.

10

*See* **Mississippi Baptist Medical Center Records, Mot. Exh. 10, at MSOS-Baptist 000059.** Since leaving Baptist Medical Center, Mr. Jones has worked for two nursing services—Aya Healthcare, Inc., and then AMN Healthcare, Inc.  Aya Healthcare, Inc., paid Mr. Jones gross wages of $44,870.10 for the period beginning January 24, 2021, and ending May 1, 2021.  *See* **Aya Healthcare Records, Mot. Exh. 11, at MSOS-AYA 000051-000064.**  From June 6, 2021, through October 23, 2021, AMN Healthcare, Inc., paid Mr. Jones gross wages of $67,520.67.  *See* **AMN Healthcare Records, Mot. Exh. 12, at MSOS-AMN 0000068-000086.**  In 2021, then, Mr. Jones has earned gross wages of at least $112,390.77.

## SUMMARY-JUDGMENT STANDARD

To avoid summary judgment, Mr. Jones must produce evidence of specific facts that demonstrate that a genuine issue of material fact exists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).  "The once frequently repeated characterization of summary judgment as a disfavored procedural shortcut no longer appertains.  Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant, or where it is so overwhelming that it mandates judgment in favor of the movant."  *Armstrong v. City of Dallas*, 997 F.2d 62, 66-67 (5th Cir. 1993).  *See also Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999) (same).   Mr. Jones may not defeat it by pointing to "conclusory allegations," "a scintilla of evidence," or "some metaphysical doubt as to the material facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## ARGUMENT

Mr. Jones has asserted claims against Mr. Davis, Ms. Thornhill and Ms. Turner individually under 42 U.S.C. §§ 1981 and 1983, but it is inconceivable that those government officers' qualified immunity from liability and suit would allow maintenance of an action predicated merely on their preference for another applicant for the Director of Election Compliance

11

position or on Mr. Jones' termination for proven violations of office policy.  Because Mr. Jones has failed to allege or prove conduct that would amount to knowing violation of a constitutional or statutory right, his claims are insufficient to overcome the individual defendants' qualified immunity.  Mr. Jones' Title VII claims against the Office of Secretary of State also fail on their own terms, given the lack of any direct evidence of discrimination; any proof of a similarly situated comparator who violated office policies to the extent of Mr. Jones but was treated more favorably; and any proof that the valid, non-discriminatory reasons expressed for selecting Mr. Dailey for the Director of Election Compliance post were pretexts for unlawful discrimination.

## I.      Qualified immunity requires dismissal of all claims against Mr. Davis, Ms. Thornhill and Ms. Turner individually.

The individual claims asserted against Mr. Davis, Ms. Thornhill and Ms. Turner pursuant to §§ 1981 and 1983 are not supported by evidence sufficient to overcome the three state officers' qualified immunity. "Claims against individual public officials under § 1981 are subject to the defense of qualified immunity, as are claims against such individuals under § 1983." *Foley v. Univ. of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003).  The qualified immunity doctrine shields government officials from civil liability and the burdens of litigation if their actions were objectively reasonable in light of clearly established law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time consuming, and intrusive." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

Analysis of qualified immunity requires a two-pronged inquiry.  The threshold question asks whether the facts alleged by the com plaint—when viewed in the light most favorable to the plaintiff—establish that the officials' conduct violated a protected right. *See id.*; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If no rights would have been violated, the qualified-immunity

12

analysis comes to a quick end with dismissal of the plaintiff's claims.  If the alleged facts *would*

show a violation of a right, the second step in the qualified-immunity analysis asks "whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* at 202.   An official is entitled to immunity as long as he acted reasonably and even if he

ultimately was wrong about the legality of his actions.  Qualified immunity protects governmental

officials from individual liability "as long as their actions could reasonably have been thought

consistent with the rights they are alleged to have violated." *Good v. Curtis*, 601 F.3d 393, 400

(5th Cir. 2010).   It "provides ample protection to all but the plainly incompetent or those who

knowingly violated the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Additionally, the

plaintiff bears the burden of rebutting the application of qualified immunity.  *Pierce v. Smith*, 117

F.3d 866, 871-72 (5th Cir. 1997).

In assessing § 1983 claims in the context of qualified immunity defenses, courts must

analyze the allegations under a "heightened pleading requirement."  *See Baker v. Putnal*, 75 F.3d

190, 195 (5th Cir. 1996).   The Fifth Circuit has described the standard in cases implicating

immunity defenses as follows:

> "In the now familiar cases invoking 42 U.S.C. § 1983 we
> consistently require the claimant to state specific facts, not merely
> conclusory allegations." *Elliott v. Perez*, 751 F.2d 1472, 1479 (5th
> Cir.1985).  *See also Hobson v. Wilson*, 737 F.2d 1, 30
> (D.C.Cir.1984) ("every ... circuit has articulated a requirement of
> particularity on pleading for civil rights complaints"), cert. denied,
> —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Moreover,
> we have recently recognized a special tension in cases involving
> civil rights complaints against public officials for actions undertaken
> in their official capacities. In this context, liberal notions of notice
> pleading must ultimately give way to immunity doctrines that
> protect us from having the work of our public officials chilled or
> disrupted by participation in the trial or the pretrial development of
> civil lawsuits. Thus, in *Elliot*, we held that, to commence a lawsuit
> against a public official for acts for which he is potentially immune,
> the complaint must allege "with particularity all material facts on

> which [the claimant] contends he will establish his right to recovery,
> which will include detailed facts supporting the contention that the
> plea of immunity cannot be sustained." *Id.* 751 F.2d at 1482.

*Morrison v. City of Baton Rouge*, 761 F.2d 242, 244-245 (5th Cir. 1985); *Brown v. Texas A&M Univ.*, 804 F.2d 327, 333 (5th Cir. 1986) ("[T]he plaintiff must plead specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery, including those necessary to negative the defense of qualified immunity.")

Mr. Jones has generally *alleged* a violation of a constitutional right—that is, racially motivated discrimination or discrimination in retaliation for exercise of First Amendment rights. However, to maintain an individual claim of liability against each individual, the plaintiff must also show that each individual defendant's conduct was objectively unreasonable. Here, the Complaint's allegations and the record evidence regarding each individual defendant fall substantially short of that mark. They include no proof of material facts or conduct by Mr. Davis, Ms. Thornhill or Ms. Turner which show any of those defendants knowingly violated Mr. Jones' constitutional rights by failing to promote him to the Director of Election Compliance position or by participating in his termination. Regarding the promotion decision, the record includes contemporaneous documentation of the lawful, non-discriminatory reasons for preferring another applicant to Mr. Jones—that Mr. Jones' writing skills were deficient, that he was not productive, that he disregarded restrictions on what he was authorized to communicate outside of the office, that he lacked an accurate understanding of the duties of the position he sought, and that his plans for the position were unworkable. Mr. Jones' manifest misunderstanding of what the Director of Elections Compliance position entailed and problems completing assignments amounted to objective reasons for preferring another candidate for the post. Even if all of the aforementioned characteristics of Mr. Jones' record are regarded as subjective, though, existing law unambiguously provided that employers "may rely on subjective reasons to select one candidate

over another." *Martinez v. Texas Workforce Comm'n.*, 775 F.3d 685, 688 (5th Cir. 2014). Mr. Jones has failed to present any evidence that Mr. Davis, Ms. Thornhill or Ms. Turner considered Mr. Jones' race or any protected First Amendment activity[3] in deliberating on who should fill the Director of Elections Compliance position.

Similarly, regarding the termination of Mr. Jones employment, the record demonstrates that Mr. Jones was dismissed for violations of office policy *that he acknowledges*. As provided by an Order [Doc. No. 51] of this Court, Mr. Jones has admitted performing online classwork on his work computer; admitted that he spent the *majority of the work day* performing non-work activity on September 22, September 25, and September 26, 2017; admitted that he submitted false time records to the agency; admitted staying in his office after he was permitted to do so on at least five occasions; and admitted the accuracy of Internet usage reports that document his use of taxpayer resources to perform extensive non-work activity. ***See* Defendants' First Set of Requests for Admission, Mot. Exh. 8; Order, Doc. No. 51 (deeming Requests for Admission admitted).** It is inconceivable that § 1983 liability could extend to state employees who signed off on the termination of an employee for reasons authorized by their office's policy. Evidence of a knowing violation of Mr. Jones' constitutional rights is wholly absent from that record. The

---

[3] Mr. Jones did not claim in his 2016 EEOC Charge of Discrimination that he had been denied a promotion in retaliation for exercising any First Amendment right, but his Second Amended Complaint accuses the Secretary of State's Office of admitting in its EEOC Position Statement that it considered "prior complaints of discrimination" in selecting Mr. Dailey rather than Mr. Jones for the Director of Elections Compliance position. This is false. It is also insufficient in any event to assert a tenable constitutional claim against an assertion of qualified immunity by the individual Defendants. The record contains no proof of pre-2016 complaints of discrimination or harassment by Mr. Jones other than internal ones that related to his job duties. "It … is not clearly established that an internal complaint of discrimination made only to supervisors, primarily to vindicate one's own rights, qualifies as" protected First Amendment speech. *See Johnson v. Halstead*, 916 F.3d 410, 423 (5th Cir. 2019) (concluding that such a claim cannot overcome an individual defendant's qualified immunity); *see also Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008) ("[T]he caselaw is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection.").

individual §§ 1981 and 1983 claims against Mr. Davis, Ms. Thornhill, and Ms. Turner must be dismissed because of their qualified immunity.

## II.      Mr. Jones' Title VII and § 1981 claims fail on their own terms.

Mr. Jones "can prove disparate treatment" under Title VII either by (1) direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) indirect evidence, by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014); *TWA v. Thurston*, 469 U.S. 111, 121 (1985); *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016).  "Direct evidence is evidence which, if believed, proves [disparate treatment] without inference or presumption."  *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).  Mr. Jones has not presented *any* direct evidence of discrimination.

Thus, the legal standards applicable to his suit are the shifting burdens of production and proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973).  *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226-227 (5th Cir. 2015).  Specifically, under Title VII and 42 U.S.C. § 1981, he must show that "(1) he belongs to a protected group; (2) [he] was qualified for his position; (3) [he] suffered an adverse employment action; and (4) … in the case of disparate treatment, ... similarly situated employees were treated more favorably."  *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2001)).

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to rebut the presumption of discrimination by producing evidence that the adverse employment action was taken for a non-discriminatory reason.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas*, 411 U.S. at 802.  Though the burden of production then

shifts to the employer, the burden of persuasion remains at all times on the plaintiff. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   Indeed, the employer's reason for the adverse employment action need not be persuasive or credible. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002). Instead, the defendant's burden is to "produce evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quoting *Hicks*, 509 U.S. at 509).

Once the employer meets its burden, the plaintiff may demonstrate that the proffered reason was mere pretext. *Reeves*, 530 U.S. at 143; *McDonnell Douglas*, 411 U.S. at 804.  Once a case reaches this pretext stage, "the *only* question on summary judgment is whether there is a conflict in *substantial evidence* to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (emphasis added); *see also Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1185 (5th Cir. 1997) ("[P]laintiff's case must, at the very least create a conflict of substantial evidence from which the jury may infer illegal discrimination").  "The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." *Swanson*, 110 F.3d at 1185.

Furthermore, at the pretext stage in a retaliation case, "[t]o establish the requisite causal connection between the protected activity and the adverse employment action, a plaintiff must show that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017). In other words, a Title VII retaliation plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v.*

*Nassar*, 570 U.S. 338, 360 (2013). "[T]emporal proximity alone is insufficient to prove but-for causation." *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007).

### A. The record contains no evidence proving that Mr. Jones was qualified for the promotion he sought or that the reasons expressed for the agency's decision were pretextual.

The analysis of the promotion decision challenged by Mr. Jones should not reach the pretext stage, because Mr. Jones was not qualified for the Director of Elections Compliance post. Should it survive until that phase, though, Mr. Jones' claim would fail for lack of any evidence that the agency's reasons for hiring Mr. Dailey for the Director of Elections Compliance Director post were cover for racial discrimination or retaliation.   To make out a prima facie case of racial discrimination with respect to a failure to promote, Mr. Jones must show that (1) he was not promoted; (2) he was qualified for the position sought; (3) he fell within a protected class at the time of the failure to promote; and (4) his employer either gave the promotion to someone outside the protected class or otherwise refused to promote Mr. Jones because of his race.   *Gregory v. Town of Verona*, 574 Fed. App'x. 525, 528 (5th Cir. July 7, 2014) (*citing Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346-47 (5th Cir. 2013).  According to the Fifth Circuit, Mr. Jones must show that the disparity in qualifications between the successful applicant and himself "are of such weight and significance that no reasonable person…could have chosen the candidate selected over the Plaintiff for the job in question."  *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 357 (5th Cir. 1993).

Charitably put, such compelling evidence that Mr. Jones was clearly more qualified than Mr. Dailey is entirely lacking from the record here.  As reported by Ms. Turner in her April 15, 2016, e-mail, Mr. Jones was not productive, resisted directions from his supervisors, and primarily worked with lobbyists.  Moreover, in his interview, Mr. Jones betrayed a clear misunderstanding

of what the Director of Elections Compliance would do.  Mr. Dailey, by contrast, had volunteered to take on responsibilities in that division, become familiar with the position, and impressed his supervisors as an industrious "team player" with excellent communications skills.  As noted above, the decision not to award the position to Mr. Jones was based on objective factors, such as his indisputably poor understanding of what the job required.  Nevertheless, even assuming for the sake of argument that the agency's reasons for preferring Mr. Dailey were entirely subjective, employers "may rely on subjective reasons to select one candidate over another." *Martinez*, 775 F.3d at 688 (5th Cir. 2014); *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason.")  Mr. Jones, accordingly, has failed to produce an essential ingredient of a prima facie failure-to-promote case under Title VII by showing that he was qualified for the position at issue.

Even if he had made out the prima facie case required of him, though, the Secretary of State's Office has produced—in the form of Ms. Turner's April 15, 2016 e-mail—a relatively lengthy, contemporaneous elaboration of legitimate, non-discriminatory reasons why it selected Mr. Dailey for the Director of Elections Compliance post.  The record is bereft of evidence that her reasoning was a pretext for some discriminatory animus by the agency against Mr. Jones. Indeed, it shows that the agency offered Mr. Jones a promotion to another position—Lobbying and Campaign Finance Officer—at the same time it awarded the Elections Compliance position to Mr. Dailey, and that that job paid only $824 less annually than the post for which Mr. Dailey was hired.

Mr. Jones has pointed to a footnote in the agency's EEOC Position Statement as proof that the Secretary of State's Office "explicitly stated that the Plaintiff's prior complaints of

discrimination were considered in denying him the promotion he sought." *See* **Pl.'s Compl., Doc. No. 88, at ¶15.**  This is a gross misrepresentation of that footnote, which notes, accurately, that Mr. Jones frequently claimed that decisions adverse to him amounted to discrimination or harassment.  *See* **Thornhill Affidavit, Mot. Exh. 1, at Exh. E, at 3**.  It is linked to a section of the main body of text in which the agency explains that Mr. Jones was unhappy with its promotion of Mr. Dailey, who had been with the agency for fewer years than Mr. Jones, but that factors other than seniority are considered in making employment decisions.  *Id.*, at 2-3.  Even if the footnote were proof of discriminatory animus (and it is not), rather than contextualization showing that Mr. Jones tends to make frivolous discrimination claims (and it is), it would still fail to demonstrate that the promotion decision was predicated upon a retaliatory motive.  Moreover, to substantiate a summary-judgment-proof claim of retaliation, Mr. Jones would have to prove that the alleged retaliation was *the only motive* for the adverse action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that a Title VII retaliation plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").  The negative evaluation of Mr. Jones' performance contained in Ms. Turner's email—and the documentary evidence supporting it—renders such a finding inconceivable.

The EEOC Letter of Determination, meanwhile, contains no competent fact-based reasoning and does not create a triable issue of fact regarding the promotion decision.  *See* **Thornhill Affidavit, Mot. Exh. 1, at Exh. F.**  The Fifth Circuit and this Court have held that an EEOC determination may not preclude summary judgment if it is merely "conclusory" or contradicted by competent summary judgment evidence.  *See Wright v. Columbia Women & Children's Hospital*, 34 Fed. App'x. 151, 2002 WL 495325, *4 (5th Cir. 2002) (holding that an EEOC determination was "conclusory" and "not sufficient to defeat the motion for summary

judgment" when it "contains only the broadest legal and factual conclusions, does not identify the qualifications taken into account by the EEOC, and does not outline the nature of the investigation conducted"); *Moore v. Univ. of Miss. Med. Ctr.*, No. 3:16cv52TSL-RHW, 2017 WL 5654749, *6 (S.D. Miss. April 7, 2017) ("[E]ven if the court were to assume for the sake of argument that the EEOC determination could be properly admitted, the determination would not tend to create a triable issue as it is *entirely* conclusory and contrary to the record evidence") (emphasis in original); *see also Chavarria v. Despachos Del Notre, Inc.*, 390 F.Supp.2d 591, 598 n.9 (S.D. Tex. 2005) ("If the summary judgment record independent of the letter of determination does not raise an issue of material fact that would prevent the grant of summary judgment, the Court is not persuaded that it should treat a favorable EEOC investigation and letter of determination as creating an issue of fact.").   In this case, the EEOC's Letter of Determination exemplifies the "conclusory" style.   After reciting the contentions of Mr. Jones and the agency, it states:

> I have determined the evidence obtained in the investigation established reasonable cause to believe that Charging Party was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended.   The evidence showed that Charging Party was not promoted into the director of elections compliance's position because of his race and in retaliation for opposing a protected activity.
>
> The evidence showed Charging Party had ten (10) years of work related experience and a bachelor's degree in political science plus a master's degree in public administration while the successful white applicant had only nine (9) months of work related experience and a degree in accounting plus five (5) years of coaching experience.   The evidence showed that the Respondent's subjective interview conducted by a white official was discriminatory on its face.   Direct evidence also showed that Charging Party's non-selection for promotion was directly linked to his protest of his employer's discriminatory policies.

*See* Thornhill Affidavit, Mot. Exh. 1, at Exh. F, at 1. The EEOC thus makes virtually no attempt to link its charge of retaliation to evidence, fails to describe the investigation, and overlooks the

evidence of the applicants' respective qualifications presented in support of this motion.  It fails to rebut the reasoning of Ms. Turner's detailed email memo concerning the respective qualifications of Mr. Dailey and Mr. Jones; indeed, it omits any mention of that email.[4]  Its only factual allegations concern evidence that is irrelevant—as the request for applications for the Director of Elections Compliance post makes plain, the criteria by which applicants were evaluated did not include length of time they had worked for the Secretary of State's Office or the types of degrees they possessed.  *See EEOC v. Louisiana Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir.1995) (stating that employment-discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor ... to transform the courts into personnel managers.") The EEOC Letter of Determination is not admissible evidence, should not be considered on summary judgment, and, even if considered, falls short of identifying a triable fact issue.

As noted, a Title VII retaliation plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.  Such a showing has not been made here—Mr. Jones has presented no evidence that he would have received the promotion but for some protected activity, and the record presents a host of other reasons, such as his poor understanding of what the Director of Elections Compliance position entailed, why Mr. Jones did not obtain the job he sought.

### B.  The record confirms that Mr. Jones' employment was terminated for his flagrant and repeated violations of office policy.

Mr. Jones has similarly failed to create a factual dispute sufficient to overcome summary judgment for the agency on any claim that he was terminated because of his race or in retaliation for filing an EEOC claim against the Secretary of State's Office.   His repeated violations of office

---

[4] In addition to the defects in its initial Letter of Determination, the EEOC similarly failed subsequently to address voluminous evidence presented in support of the request for reconsideration submitted by the Secretary of State's Office.

policy were undisputed at the time and have been confirmed during discovery in this matter.  ***See, e.g.,* Order, Doc. No. 51; Defendants' First Set of Requests for Admission, Mot. Exh. 8.**

### 1. Mr. Jones has failed to substantiate any retaliation claim against the Secretary of State's Office.

To make out a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in activity protected under Title VII, (2) an adverse employment action occurred, and (3) there was a causal connection between her protected activity and the adverse employment decision." *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 327-28 (5th Cir. 2019).  At the initial stage of the analysis, "a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).  In this case, Mr. Jones has relied entirely on the chronological proximity between his 2016 EEOC Charge of Discrimination and the 2017 termination of his employment. However, "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  "Action taken…20 months later suggests, by itself, no causality at all," the *Breeden* Court held.  *Id.* at 274. Here, Mr. Jones indisputably engaged in protected activity by filing an EEOC Charge of Discrimination in June 2016.  However, the disciplinary proceedings which culminated in the termination of his employment did not commence until September 2017.  The Fifth Circuit recently held that a gap of more than a year between an adverse action and the filing of an EEOC charge "is insufficient to establish a prima facie case of retaliation."  *See Montgomery-Smith v. George*, 810 Fed. App'x.  252, 261-62 (5th Cir. April 17, 2020).  Furthermore, courts have held that intervening causes—such as, here, Mr. Jones' violation of several office policies—break the chain

of causation even given a relatively brief lapse of time between protected activity and an adverse action. *See Gleason v. Mesirow Financial*, 118 F.3d 1134, 1147 (7th Cir. 1997) (finding termination only a few weeks after the plaintiff complained insufficient to establish a causal link where discharge closely followed a "significant and costly error"); *Robinson v. AFA Serv. Corp.*, 870 F.Supp. 1077, 1084 (N.D. Ga. 1994) (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); *Booth v. Birmingham News Co.*, 704 F.Supp. 213, 215–16 (N.D. Ala. 1988) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," i.e., other reasons for the adverse action arising after the protected activity). The timeline of relevant events, therefore, fails even to support a prima facie case that Mr. Jones' employment was terminated because of the EEOC filing.

Mr. Jones has also pointed to the proximity between the date on his Pre-Disciplinary Action Notice (October 12) and the date (October 11) on the EEOC's denial of the Office of Secretary of State's Request for Reconsideration. But the EEOC's letter is not protected speech by Mr. Jones, and, even assuming it could qualify as some protected activity of his, the agency did not receive it until October 13. That is, the agency had no knowledge of the denial until nearly two weeks after it began drafting the Pre-Disciplinary Action Notice and a day after it delivered the finalized draft to him. Obviously, the EEOC correspondence could not have caused the agency to take actions that occurred before the agency knew about the correspondence.

Even if Mr. Jones' proof were enough to establish a prima facie case (and it is not), the record establishes legitimate, non-discriminatory reasons for his dismissal. It is conceded that Mr. Jones committed multiple violations of office policy, misappropriating taxpayer resources for hours of classwork and other personal use and then submitting false time records. The Secretary

24

of State's Office cited those rule violations as its reasons for terminating Mr. Jones' employment in its October 30, 2017 Notice of Termination.  "[T]emporal proximity alone is insufficient to prove but-for causation." *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007). But Mr. Jones has cited no evidence other than temporal proximity to support the Title VII retaliation claim stemming from his employment's termination.  Accordingly, that claim is untenable.

### 2. Mr. Jones has failed to show that his employment was terminated because of his race.

Mr. Jones has also alleged that the Secretary of State's Office terminated his employment because of his race.  Such a claim requires proof that "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).  Mr. Jones has failed to make out a prima facie case given the lack of any comparator to satisfy element (4).  He has pointed to Marla Breland, a white female who was employed in the agency's Securities Division until October 10, 2014.  On that date, the Secretary of State's Office delivered to Ms. Breland a notice of its intent to terminate her employment given her violations of the Internet Usage Policy.  ***See* Thornhill Affidavit, Mot. Exh. 1, at Exh. S.**  Mr. Jones has complained that Ms. Breland was allowed to resign, rather than being terminated following the administrative proceedings provided to him.  This ignores that Ms. Breland was not a state service employee like Mr. Jones, to whom Mississippi law required the Secretary of State's Office to provide due process before taking any action to terminate his employment.  *See Miss. Dep't. of Transp. v. Rutland*, 965 So.2d 696, 699-700 (Miss. Ct. App. 2007) ("A key distinction between state service employees

and non-state service employees is that state service employees may only be terminated for good cause, after written notice and a hearing") (citing Miss. Code Ann. § 25-9-127). Likewise, Ms. Breland was charged on October 10, 2014, with one (1) violation of office policy, not the multiple violations admitted by Mr. Jones.  Finally, Mr. Jones *did not resign or ask to resign despite his opportunity to do so at any time prior to his November 10, 2017 termination*.  These circumstances are not comparable, much less the "nearly identical" situations required to make out a prima facie Title VII case of racial discrimination.

### III.   Mr. Jones is barred from receiving any back pay and from receiving punitive damages from the Secretary of State's Office.

Even if Mr. Jones were able to establish that some or all of the defendants are liable to him, however, he is barred from obtaining several categories of damages he seeks.  First, as a state agency, the Secretary of State's Office is not subject to punitive damages under either Title VII, § 1981, or § 1983. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision)...."); *Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 466 (5th Cir.2001) (stating that Title VII precludes award of punitive damages against governmental entity); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (concluding that punitive damages are unavailable for § 1983 claims against governmental entities).  Second, as Mr. Jones simply continued until May 2019 the academic pursuits and part-time UMMC employment in which he was engaged while working full time for the Secretary of State's Office, there are no facts from which a reasonable jury could conclude that Mr. Jones exercised "reasonable diligence" to obtain "substantially equivalent work." *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990).  In his own discretion and judgment, he removed himself from the workforce in order to pursue full-time coursework until he received his degree.  After he

graduated from Mississippi College in May 2019 and commenced work as a full-time nurse, as the records show, he was paid three times more on an annual basis than he could have made in his last job at the Secretary of State's Office or as Director of Elections Compliance going forward.  Hence, summary judgment is warranted against his claims for back pay.    Finally, Mr. Jones' claim for emotional-distress damages is untenable given the lack of any evidence of "specific discernable injury" to his "emotional state."  *Farpella-Cosby v. Horizon Health Care,* 97 F.3d 803, 808 (5th Cir. 1996).

### IV.   The Secretary of State's Office is entitled to summary judgment on its counter-claims against Mr. Jones for fraud and negligent misrepresentation.

Finally, the Mississippi Secretary of State's Office seeks summary judgment on its counterclaim against Mr. Jones for recovery of the damages they incurred due to the conceded misrepresentations contained on the time records he submitted to induce the agency to pay him during the week of September 22-29, 2017.  The Secretary of State's Office has asserted counter-claims against Mr. Jones for fraud and negligent misrepresentation.  In Mississippi, fraud requires proof of (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorant of its truth; (5) his intent that it should be acted on by the person in a manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) his consequent and proximate injury.  *Trim v. Trim*, 33 So. 3d 471, 478 (Miss. 2010).  Similarly, negligent misrepresentation requires "(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance." *Horace Mann Life Ins. Co.*

*v. Nunaley*, 960 So.2d 455, 461 (Miss.2007).  It is a matter of admitted fact in this litigation that time sheets prepared by Mr. Jones and submitted to the Secretary of State's Office contained misrepresentations regarding the amount of time he worked each day.  ***See, e.g.,* Order, Doc. No. 51; Defendants' First Set of Requests for Admission, Mot. Exh. 8.**  It is not disputed that the Secretary of State's Office relied on those reports to pay Mr. Jones.  It is also uncontroverted that reports compiled by the Secretary of State's Office concerning Mr. Jones' non-work-related computer usage are accurate.  Those reports show that Mr. Jones was completing class assignments, reading online textbooks, checking grades, and performing other activities unrelated to work on his agency computer from September 22, 2017, through September 29, 2017. According to the uncontroverted opinion of Russell Walker, an expert designated by the Secretary of State's Office, the records show that Mr. Jones spent 4 hours and 46 minutes completing non-work activity on September 22; 6 hours and 55 minutes completing non-work activity on September 25; 5 hours and 46 minutes completing non-work activity on September 26; 3 hours and 14 minutes completing non-work activity on September 27; and 2 hours and 33 minutes completing non-work activity on September 28; and 1 hour and 22 minutes completing non-work activity on September 29.  Given that Mr. Jones' hourly rate of pay was $17.33, **Thornhill Affidavit, Mot. Exh. 1, at Exh. T,** the Secretary of State's Office seeks a summary judgment awarding it $426.32, plus pre-judgment interest, from Mr. Jones for the 24.6 hours for which he received payment from the Secretary of State's Office but spent working on personal activities.

## CONCLUSION

Kenneth Jones did not receive the promotion he sought in 2016 because his employer preferred another candidate for legitimate, non-discriminatory reasons.  He then lost his job in 2017 because of violations of office rules and policies which he has admitted—including misuse of office resources and falsification of time records that resulted in the theft of money from the

State of Mississippi.  These facts provide no basis for a civil-rights claim under either § 1981, § 1983, or Title VII.  The Court should grant summary judgment against all of Mr. Jones' claims. Should the Court allow some of his claims to proceed to a jury, it should nevertheless bar Mr. Jones from claiming punitive damages from the Secretary of State's Office, any back pay and any claim for emotional-distress damages.   The Secretary of State's Office, meanwhile, is entitled to recover $426.32, plus pre-judgment interest, on its counter-claims against Mr. Jones for fraud and negligent misrepresentation, along with attorney fees under Mississippi state law given that fraud is an intentional tort.  *See Scarborough v. Rollins*, 44 So.3d 381, 388 (Miss. Ct. App. 2010). Finally, because this action is frivolous, unreasonable and without foundation, even if not brought in subjective bad faith, Defendants ask for an award of their reasonable attorney fees.  *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).

Respectfully submitted, this 30th day of December, 2021.

MISSISSIPPI SECRETARY OF STATE'S OFFICE; CARLA THORNHILL, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; DOUG DAVIS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; AND KIM TURNER, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY

BY:   Balch & Bingham LLP


BY:    s/ Benjamin Bryant
           *Of Counsel*


Armin J. Moeller, Jr. (3399)
E-mail: amoeller@balch.com
Ashley Eley Cannady (101253)
E-mail: acannady@balch.com
Benjamin Bryant (103623)
E-mail: bbryant@balch.com
M. Patrick Everman (104870)

E-mail: peverman@balch.com
BALCH & BINGHAM LLP
188 East Capitol Street
Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466

## CERTIFICATE OF SERVICE

I, the undersigned counsel, do hereby certify that I have this day served, via the Court's Electronic Filing System, a true and correct copy of the above and foregoing document to all counsel of record.

This, the 30th day of December, 2021.

/s/ Benjamin Bryant_____

Of Counsel